## Case No. 17,194.

WARREN v. DELAWARE, L. & W. RY.
CO.

[7 N. B. R. 451;[1] 5 Chi. Leg. News, 205; 4
Leg. Op. 533.]

District Court, N. D. New York. Dec. 23,
1872.

BANKRUPTCY—BILL BY ASSIGNEE TO AVOID FRAUD-
ULENT JUDGMENTS—COSTS.

An assignee in bankruptcy filed a bill in equi-
ty against a creditor of the bankrupt for the pur-
pose of obtaining a decree that several judg-
ments in favor of that creditor and against the
bankrupt, and the executions issued thereon
were fraudulent and void as against the said as-
signee. *Held*, that under the proofs in the case
and the authorities cited, the assignee's right to
the decree was undoubted; that the judgments
in question were obtained when the bankrupt
was insolvent, such creditor having reasonable
cause to believe his debtor was insolvent at the
time such actions were brought: that the credit-
or having fought this case to the bitter end to
maintain his preference, the assignee must have
costs.

In equity.

HALL, District Judge. This is a bill in
equity, filed by the plaintiff, as assignee in
bankruptcy of the Wadsworth Iron Works, for
the purpose of obtaining a decree that several
judgments in favor of the defendant, against
the bankrupt, and the executions issued there-
on are fraudulent and void as against such
assignee. The petition in bankruptcy, under
which the plaintiff was appointed assignee, was
filed against the bankrupt on the 20th day of
April, 1871. It appears by the pleadings and
proofs that in February, March and April,
1871, the defendant recovered against the
bankrupt, by default, five several judgments
in the supreme court of the state of New York,
and procured executions to be issued thereon
to the sheriff of Erie county by whom such
executions were levied upon the personal prop-
erty of the bankrupt. Such judgments may
be, briefly, further described as follows, viz.:

I. A judgment recovered February 18th,
1871, for the sum of eight thousand nine hun-
dred and fifty-one dollars and two cents upon
a promissory note of the bankrupt for eight
thousand eight hundred and eighty-five dollars
and sixty cents, dated October 18th, 1870, and
payable in three months after the date thereof.

II. A judgment for four thousand seven hun-
dred and fifty-seven dollars and seventy cents,
recovered February 25th, 1871. on the promis-
sory note of the bankrupt for four thousand
seven hundred and sixteen dollars and ninety-
two cents, dated October 25th, 1870, and paya-
ble in three months after the date thereof.

III. A judgment for four thousand seven
hundred and sixty dollars and fifty-three cents,
recovered March 4th, 1871, on a promissory note
of the bankrupt for four thousand seven hun-
dred and sixteen dollars and ninety-two cents,
dated November 1st, 1870, and payable in three
months after such date.

[1] [Reprinted from 7 N. B. R. 451, by permis-
sion.]

IV. A judgment for four thousand seven
hundred and fifty-nine dollars and fifty-eight
cents, recovered March 7th, 1871, on a promis-
sory note of the bankrupt dated November 7th,
1870, and payable three months after such date.

V. A judgment recovered April 1st, 1871, for
five thousand nine hundred and forty dollars
and thirty-four cents, on a promissory note of
the bankrupt, dated December 1, 1870, and
payable in three months after date.

It further appears that no defence was in-
terposed in any or either of the suits in which
said judgments were so recovered; and upon
the proof in the case it is very clear that the
Wadsworth Iron Works, the bankrupt and de-
fendant in such suits, for some time prior to
January 1st, 1870, and ever after, was, in fact,
insolvent and wholly unable to pay all its debts
as they fell due in the ordinary course of busi-
ness; and that the property of such bankrupt
was never, after that time, sufficient to pay
and discharge all its debts and liabilities upon
a final settlement and closing of its business
and estate. It also appears that a promissory
note of the bankrupt, dated September 11th,
1870, for eight thousand four hundred and
eighty-six dollars and ten cents, payable to the
defendant three months after its date, and
which had been endorsed by the defendant to
the National City Bank of New York, was pro-
tested for non-payment at its maturity, De-
cember 3d, 1870; that the bankrupt was soon
after prosecuted thereon by such bank at the
request of the financial agents of the defendant;
that a judgment was recovered thereon against
the bankrupt by default, for the amount there-
of, January 3d, 1871; that another note of the
bankrupt, dated October 1st, 1870, and given
to the defendant for the sum of eight thousand
eight hundred and fifty-five dollars and nine-
ty cents, payable three months after date, was
also protested for non-payment at its maturity,
and that the defendant recovered a judgment
by default against the bankrupt for the amount
thereof, February 1st, 1871; that the amount
of the first of the two judgments last above
named was collected by or paid to the sheriff,
February 27th, 1861; and that the amount of
the second was so paid or collected, March
27th, 1871. It also appears that Mr. Wads-
worth, the president and chief manager of the
bankrupt corporation, at some time in the fall
of 1870, applied to the financial officers of the
defendant for an extension of payment on a
promissory note of the bankrupt about to fall
due, and which had been given to the defend-
ant by the bankrupt; and that in answer to
such application he was told that the note had
passed out of the hands of the defendant; that
shortly before the maturity of the said note
falling due December 3d, 1870, he applied for
an extension of the payment of such note, and
stated that if the payment of that note and the
one to become due in January could be extend-
ed he would pay the others at maturity; that
such application was declined and that there-
upon Mr. Wadsworth was very angry.

The bankrupt was a manufacturer and the

seven notes referred to were severally its commercial paper. It is thus apparent that the Wadsworth Iron Works was not only insolvent when each of the notes upon which the judgments in controversy in this suit matured, but that it had committed repeated acts of bankruptcy to the knowledge of the defendant's officers and agents before the first of such judgments was recovered. That the agents and officers of the defendant had not only reasonable but very abundant cause to believe that the Wadsworth Iron Works was then insolvent is beyond doubt; and they certainly knew it was bankrupt, and liable to be proceeded against under the bankrupt act [of 1867 (14 Stat. 517)]. Under such circumstances the judgments in controversy can only be sustained, if they can be sustained at all, upon very clear and satisfactory proofs to repel the legal presumptions of actual or legal intent to give and to obtain a preference in fraud of the provisions, policy and purpose of the bankrupt act. Shawhan v. Wherrit, 7 How. [48 U. S.] 627; In re Bininger [Case No. 1,420]; Bump, Bankr. (5th Ed.) 468–470; In re Bininger [Case No. 1,420].

It was strongly insisted that there was no intention on the part of the bankrupt corporation to give a preference to the defendant, and the testimony of the treasurer and another active officer of the defendant has been taken for the purpose of showing that the omission to pay the notes above referred to, and the suffering of the judgments, executions and levies upon the property of the corporation as heretofore stated, were believed to be, and were, the result of a feeling of spite and vindictiveness on the part of Wadsworth, the principal stockholder and president of the bankrupt corporation, caused by the refusal of the defendant to grant an extension of further time for the payment of the aforesaid notes which fell due December 3d, 1870, and January 4th, 1871. The testimony of Mr. Wadsworth was not taken by either party, and the other evidence in the case is very far from satisfactorily establishing the allegation that he acted under the influence of such feeling, and intended, by refusing to cause the payment of the commercial paper of the corporation, and then suffering judgments, executions, and levies, as hereinbefore set forth, to injure rather than benefit the defendant. It must be presumed that he, as the principal stockholder, chief officer and manager of the corporation, knew, as the vice-president (who was examined) well knew, that the corporation was hopelessly insolvent and wholly unable to pay its debts in full. Knowing this and suffering these judgments to be taken and executions to be issued and levied, one after another, for many weeks, without giving notice to other creditors that they might institute proceedings in bankruptcy, he can not be allowed to say that he did not intend to give a preference to the defendant. He clearly intended to suffer and allow precisely what was done, and, as the necessary and inevitable consequence of its being done was to give such preference, he could not, if he had been examined as a witness, have effectually denied the intention which, under such circumstances, is by law conclusively presumed. In re Bininger [supra], and cases there cited; Bump, Bankr. (5th Ed.) 49, 472–477, and cases cited; Toof v. Martin [13 Wall. (80 U. S.) 40].

The suffering of the judgments, executions and levies in controversy, was, in effect, a transfer of so much of the bankrupt's property as was necessary to satisfy such executions, while the bankrupt was hopelessly insolvent, and when the defendant had reasonable cause to believe such insolvency existed, and knew that acts of bankruptcy had been committed. The leading case of Toof v. Martin [supra], decided by the supreme court of the United States at the last December term, and which is only an affirmance of doctrines frequently acted upon by judges of the circuit and district courts, is deemed entirely decisive of this case. In that case it was declared by the court that "it is a general principle that every one must be presumed to intend the necessary consequences of his acts. The transfer in any case, by a debtor, of a large portion of his property, while he is insolvent, to one creditor, without making provision for an equal distribution of its proceeds to all his creditors, necessarily operates as a preference to him, and must be taken as conclusive evidence that a preference was intended, unless the debtor can show that he was at the time ignorant of his insolvency, and that his affairs were such that he could reasonably expect to pay all his debts. The burden of proof is upon him in such case, and not upon the assignee or contestant in bankruptcy. * * *" "It is manifest not only that the bankrupts were insolvent when they made the conveyances in controversy, but that the creditors Toof, Phillips & Co., had reasonable cause to believe that they were insolvent. The statute, to defeat the conveyances, does not require that the creditors should have had absolute knowledge on the point, nor even that they should, in fact, have had any belief on the subject. It only requires that they should have had reasonable cause to believe that such was the fact. And reasonable cause they must be considered to have had when such a state of facts was brought to their notice in respect to the affairs and pecuniary condition of the bankrupts as would have led prudent business men to the conclusion that they could not meet their obligations in the ordinary course of their business. * * * It only remains to add that the creditors had also reasonable ground to believe that the conveyances were made in fraud of the provisions of the act. This, indeed, follows necessarily from the facts already stated. The act of congress was designed to secure an equal distribution of the property of an insolvent debtor among his creditors, and any transfer made with a view to secure the property, or any part of it, to any one, and thus prevent

an equal distribution, is a transfer in fraud of the act." See, also, Smith v. Buchanan [Case No. 13,016]; Haskell v. Ingalls [Id. 6.193]; Bump, Bankr. (5th Ed.) 478, 479, and cases cited.

It was very earnestly insisted in behalf of the defendant, that the officers and agents of the defendant actually believed the bankrupt corporation to be entirely solvent, until after the proceedings in bankruptcy were commenced, and that the repeated failures of the bankrupt to pay at maturity, and the long continued suspension of the payment of the commercial paper in which the defendant was so largely interested, and the suffering of judgments, executions and levies to be had thereon, was caused by the unwillingness and not by the inability of the debtor; and that they sought to obtain such judgments without any intent to obtain a preference, and without any suspicion or cause to suppose that a fraud on the bankrupt act was intended. In support of these positions the testimony of two of the defendant's officers and agents was relied on, and one of them, although he knew at the time that an urgent application for an extension upon one or two of the first of the dishonored notes herein referred to was made a short time before the first of said notes became due, and also knew of the repeated failures to pay such notes, and of the legal proceedings thereon promptly commenced upon such refusals to pay, and had been told by the president of the defendant immediately after Mr. Wadsworth first refused to meet his indebtedness to the defendant, that "he (the witness) must get the money out of it as soon as he could," nevertheless testified that up to time of the issuing of the execution on the last judgment against the bankrupt he believed the bankrupt to be responsible and solvent; that he had no information to the contrary, and that when he obtained such judgments and caused executions to be issued, it was not done with any intent to obtain a preference over any other creditor. In charity to the witness it may be presumed that he testified in ignorance of the legal definition of insolvency, and of the natural and legal presumptions arising upon the knowledge and information in his possession, and perhaps confounded the ideas of motive and intent, and believed he was testifying truthfully. But to allow such testimony to control the rights of the general creditors, in cases like the present, would defeat the purposes and policy of the bankrupt act; and if the proper construction and administration of the act requires it, the act is, indeed, but a miserable abortion.

The language of the learned circuit judge who decided the Case of Bininger [Case No. 1,420], applies in its full force to the question of the intentions of the defendant, or the officers of the defendant, in this case. He says: "The debtor," (and of course the creditor, also) "must be taken to know the law, and to know the precise legal effect of his act. He did certainly intend the act and all the legal consequences of the act. "It is easy to confound motive with intent, and that has been done, I think, in the discussion of this case. It was done by the debtor, Clark, in his testimony. No doubt he testified truthfully, when he said, in substance, that he did not intend to procure the appointment of a receiver with the intent to defeat the operation of the bankrupt law. I have no doubt he means by this, that defeating or delaying the operation of the bankrupt act, was not the motive which induced him to procure such appointment. He did intend to do the very thing which hinders and defeats that act, and in judgment of law, he knew when he did it that it would have that effect. Knowing the effect he must have intended to produce it, when he voluntarily chose to do the act. Whatever his motive was, he acted voluntarily in choosing, and therefore, in intending all the legal results which would flow from his action in the matter."

Upon the proofs in this case, and the authorities cited, it is impossible to doubt the right of the plaintiff to a decree, and the defendant having fought this case to the bitter end to maintain the preference claimed, the plaintiff must have costs.

NOTE. It was not necessary in this case, or in the case of Toof v. Martin [supra] to decide the question whether acts done in contravention of the general purposes and policy of the bankrupt act, and which directly tend to defeat such policy and purpose, by securing a preference of one creditor over other creditors of a known insolvent debtor, can be held invalid and be set aside when the case cannot be brought within any of the express provisions of the act declaring fraudulent and void certain specified acts by which it is attempted to secure such preferences. See Shawhan v. Wherrit, 7 How. [48 U. S.] 627; Bell v. Leggett, 3 Seld. [7 N. Y.] 176, Beattie v. Gardner [Case No. 1,195], and cases cited.